Good morning, Your Honors, and may it please the Court. Ian Gershengorn for the Las Vegas Review-Journal. I'd like to reserve three minutes for rebuttal. The plain text of the Newspaper Preservation Act makes clear that it is unlawful to enforce or perform the 2005 agreement that's at the heart of this case. In 2005, the Sun and the Review-Journal entered an agreement that terminated their prior agreement and significantly reworked their joint newspaper operations. Instead of producing two separate full-size weekday papers, they agreed to produce one consolidated paper, with the Sun appearing as an eight-page insert within the Review-Journal's morning paper. Instead of distributing separate papers to separate subscriber bases, they agreed to distribute the joint paper to a single unified subscriber base. And in an agreement that goes to the heart of the antitrust laws, they expressly agreed not to publish competing newspapers directed to Clark, Nye, or Lincoln counties, basically anywhere in Southern Nevada. Under the plain text of the Act, this is an easy case. Under Section 1802, the 2005 agreement is a joint newspaper operating arrangement because it is, quote, a contract, agreement, or other arrangement pursuant to which joint or common production facilities are operated. And under Section 1803b, because the parties failed to obtain prior written consent of the Attorney General, it is, quote, unlawful for any person to perform or enforce the 2005 agreement. Now, Counselor, they're going to point to the Gild v. Levi case. Why is that wrong? So I think Levi's wrong, Your Honor, for a number of reasons. First, it's from an approach to statutory construction that I think the Supreme Court has told us is long ago abandoned. The question is, what does it mean when the Act says it shall be unlawful for to inform or perforce an agreement? So three things on the text. First, it shall be unlawful is plain and unambiguous. It means it shall be unlawful. Second, it can't be read, the statute can't be read to impose just anti- It shall be unlawful under what? It shall be unlawful just full stop under the Federal statutes, Your Honor. So if that's true, then how do you get an exemption from the antitrust laws out of AG approval under B? So I think under B, the understanding is that it is no longer unlawful, and therefore it is exempt under the antitrust laws. And I think it's the contrast. I mean, you're emphasizing the plain language, but it's not what it says. Because, you know, A says it shall not be unlawful under any antitrust laws. So it's got that phrase. But B just says it shall be unlawful except the AG. So it creates a prohibition with an exception, but the exception doesn't attach to anything else, and it doesn't have a reference to the antitrust. That's the textual problem I see with your position. So, Your Honor, so I take that point, but I actually think a couple of things. First of all, of course, that doesn't mean that you read in an antitrust. I mean, the question of whether you might not get an antitrust immunity if the AG approves is one thing. But that's to read in an antitrust immunity under it is unlawful when, A, unlawful has a settled meeting, B, in both 1803A and 1803C, Congress specifically limited it to antitrust immunity and didn't in 1803B. And the Court has to give meaning to that. And, in addition, the words, it is unlawful, like, to appear in the U.S. Code over and over, and, you know, of course, the other side doesn't respond to this point in our brief. We don't go reading in limitations to make things just antitrust immunity when the doctrine itself means unlawful. The additional point I want to make there, in addition to the text, is a couple of other points that seem to me very important. First of all, this actually makes good sense from what Congress was faced. Remember, Congress was faced with a deeply divided approach to how to deal with these newspaper arrangements. The suburban newspapers and unions were very much opposed to allowing this kind of joint operation, and so Congress did a compromise, right? In 1803A, it basically grandfathered in the 22 existing JOAs that the Supreme Court had just called into question in its Continental Publishing case. But for places going forward, they said, no, we don't want those to go forward unless the AG signs off. And the difference between immunity and unlawfulness is critical for that, because the harms to the ---- Kennedy, you're sounding like the Court in, is it Levi? Levy. Levy. Yeah. You're sounding like the Court in Levi, going back to what Congress intended here. But I guess I want to ask a different question then. What do we do with CFR 48? There, again, it's telling us that the Act does not require that all joint newspaper operating agreements obtain the prior written consent of the Attorney General. So I think it's absolutely clear that what Levi upheld in those regulations was the DOJ's position that you only get antitrust immunity. Right? But that's exactly what we say can't be accepted, if I'm understanding Your Honor's question correctly. In other words, the regulation which was upheld in the ---- But they're going to have to change their procedures. Everyone has to come in for approval. So, Your Honor, I think so. I think for that everybody does have to come into a room. First of all, I think in the real world, actually, this doesn't have a ---- Everyone does anyway because ---- There are only three of these left, Your Honor, in the country. And so there were at various times there's been as many as 30. But there's only, as we understand, this one, one in Detroit, and then there's one in York, Pennsylvania, which we think may have expired in June 2024, but we haven't been able to confirm that. But we're talking about three agreements. And, you know, I think that's sort of an important backdrop for, you know, what we're talking about here is that, you know, this is not a major ---- you know, applying the plain language as this Court should, I think, you know, is not a major disruption. But if I could go back to Your Honor's question sort of more broadly about Levy, in addition to the plain text, you know, the contemporaneous understanding, I just want to make clear, like the district court struck down the regulation in Levy. There was a dissent in ---- at the time in Levy. And as those opinions point out, the original DOJ position was our position, that unlawful means unlawful, and then DOJ changed position. So, like, in terms of plain text, in terms of contemporaneous understanding, we think we're in good position. Now, for those who look at, you know, Your Honor said that I'm giving purpose. I guess I don't. I think I'm sort of explaining the structure of the statute and providing the context. I think, A, reflects that prior to 1970, the agreements were basically grandfathered in. B says, for things going forward, we want to treat it differently. And I guess what I'm saying is I don't think that was irrational for Congress to do that, not only not irrational, but made good sense, because the harms that come, what Congress perceived as the harms that come from these agreements to suburban newspapers and to unions and to people opposed to these kind of judgments, that Congress didn't want that, or the text reflects that Congress didn't want that to go forward without the AG blessing it. If you just have an immunity from antitrust scrutiny, of course, those go forward. That may get remedied years down the road if you don't get that immunity. But by then, the harm to suburban newspapers and the harm to unions and the harm to other stakeholders has long happened. So it's perfectly understandable that Congress might have wanted that to be to have unlawful be the test. Now, the district court, if you're looking at the plain language, of course, the district court made a second holding, which was that she didn't have to even get to unusual because somehow amendments weren't covered by the plain text of the statute. And again, I think the statute really couldn't be clearer. If you look at 15 U.S.C. 1802.2, it defines the term joint newspaper operating arrangement as, quote, any contract agreement or other arrangement entered into by two or more papers pursuant to which joint or common production facilities are established or operated. And so that plainly covers the 2005 agreement. Now, the son's position is that Congress just didn't include anything on amendments. And we just think that's not a plausible interpretation of the statute and certainly doesn't justify departing from the plain text of 1802.2. First of all, it leaves a gaping hole in the statute. It means once parties are able to get an initial agreement, get the U.S. — get the attorney general consent to an initial agreement, basically any amendment is a free-for-all. They can do whatever they want. Sotomayor, even ones that add new papers? Well, so I think even ones that add new papers, if you look at the new paper restriction honor, that's in 1803a, right? I don't think that has anything to do with 1803b. And I think actually that was the district court's error. The district court viewed amendments to post-1970 agreements as covered by 1803a. We don't think that's a plausible reading of the statute at all. 1803a is by its terms and very clearly limited to pre-1970 agreements. And the statute just as clearly in 1803b covers post-1970 agreements. And the statute really couldn't be clearer that that's the division it sets up. And I don't think the son defends it. But I would suggest that amendments would include adding papers because it includes language saying not that type of amendment. And so if amendments were not within b, then the prohibition on amendments that add parties in a wouldn't apply. There would be no limitation, so you could do an amendment that didn't even do that.  I'm sorry, Your Honor. Absolutely right. I think if their interpretation is right, then you can do whatever you want in b. You can add papers. And I think this agreement illustrates – I'm sorry, Your Honor. I sort of stepped behind. But, yes, this agreement illustrates that. Like, if you look at the kinds of restrictions that happened when we went from 1989 to 2005, I mean, you know, I mentioned in my opening there's an express agreement not to compete in a governed geographic area, basically all of southern Nevada, right? Like, there is a separation from different subscriber bases where they compete to a single unified subscriber base, right? We went from separate papers to one that's an insert in another. And all of the promotion activities go to – are now being handled by the Review Journal instead of by the Sun and the Review Journal separately. And so, like, this is not the edge case, right? This is exactly the kind of thing that DOJ and the Attorney General should have looked at. And so, you know, in terms of statutory construction, I think Your Honor's suggestion, you know, shows why it can't be right. And their position is, basically, that in 1803b, Congress was silent on, quote, unquote, amendments. And we just don't think that's plausible, one, because it allows massive additions – changes to the agreement. Two, because Congress expressly addressed amendments in 1803a, so it would be very odd for them to not have addressed it in 1803b. And then in – and then, third, in a sort of comprehensive statute, the idea that Congress would address the core agreement but then be very silent on the obvious question of, well, what if they amend it, seems, you know, sort of not a plausible construction of the statute, again, particularly since in 1803a they did address it. So we think the much more sensible understanding of the statute is to follow the plain text, that basically 18022 defines what a joint newspaper operating arrangement is. It doesn't distinguish between initial agreements and amendments. What it says is any agreement – any contract agreement or other arrangement entered in by two or more newspaper owners. We think the court should give the plain meaning to 18022 and say this is covered. We think the court should give the plain meaning to 1803b and say it shall be unlawful. And we think the case is as simple as that. If the court has no questions, I'll reserve the remaining time for rebuttal. All right. Thank you, counsel. Thanks. We'll hear now from Mr. Reed. Good morning, Your Honors. May it please the court. No JOA partner has ever unilaterally sought to terminate its own JOA, have it declared illegal and void. And to eliminate its only competitor, the smaller newspaper. Everything about the RJ's arguments run directly contrary to both the letter and the spirit of the two statutes that are involved here, Section 1292A1 and the Newspaper Preservation Act. Every argument you just heard also ignores the fact that the Attorney General immunized the parties to combine all aspects of their non-editorial business functions in 1990. And when the parties executed the amendment in 2005, they didn't void or abandon that immunity. That immunity is lasting. And certainly that's what this court's decision in the Bronster case said. Can you walk through why are amendments not covered by the statute? Yes. So we start with the text, right? When we look at the language, the plain language, Section 1803B, starting first, contains no approval requirement for arrangements that have already been approved and immunized by the Attorney General. That is in contrast to the plain language of 1803A. It's a broad prohibition. It shall be unlawful for any person to enter into, perform, or enforce a joint operating arrangement not already in effect, which means not already in effect on the date of enactment, except with the prior written consent of the Attorney General of the United States. And then it has a definition of joint newspaper operating arrangement, and that means any contract agreement, joint venture, et cetera. An amended contract is still a contract. So why is it not covered by the plain language of the definition and then the plain language of the broadly written prohibition, which says no contracts of this kind, which would include an amendment, unless the AG signs on? So there's a couple aspects of, a couple layers to respond to your question, and I'll go through them now. The first is that the term defined, joint newspaper operating arrangement, isn't found in Section 1803. It's a very odd feature of this. I mean, it's a sloppily drafted statute that even misspells the United States. Yes. And has a note that it's misspelled. Because it, by my count, I think it was five times it uses the phrase joint newspaper operating arrangement, maybe seven times it drops the word newspaper. But there's no pattern to it. The only rational reading of it is that it's an accident and that it means the same thing in all of the places in which it's used. I can't see that it means different things in the two. It's just a mistake. We agree with you, okay? I don't dispute that. All right. But the term defined, and I think there is importance in the fact that Congress used the word arrangement and not agreement. The argument you hear from our friends is talking about that it's the agreement that gets approved, but that isn't accurate. 1802.2 defines something broader. It's defining the relationship. It defines not just the agreement. It defines the joint undertaking. But it says that the term joint newspaper operating arrangement means any contract agreement, joint venture, or other arrangement. So it suffices to be a contract. A contract is, by definition, a joint newspaper operating arrangement, which then is unlawful to enter into without the AG's approval. So we talked a minute ago about how the Act is an imperfect vehicle in some ways, like the misspelling of the United States. There is no evidence in the statute that Section 1802.2 was intended to put a limit on amendments, and there are two reasons for that in the plain text that I can refer you to. The first is the distinction that Congress made between amendments to JOAs and JOAs. In Subsection A, Congress didn't treat them as the same thing. An amendment is something different than the definition you see in Section 1802.2. Let me stop you there, because I'm not sure that that's right. Because B, there's an odd difference between the phrasing in B and A. B is a prohibition. It shall be unlawful. A is an exemption. It shall not be unlawful. That's how it's written. So if B is as broad as it seems and covers everything, including amendments, then you turn to A with that in place. It shall not be unlawful under any antitrust law, which this would count as an antitrust law under the broad definition, for any person to perform, enforce, renew, or amend any joint newspaper arrangement. So now that the prohibition is so broad it covers amendments, when I'm carving out, which is what A does, it's not unlawful, I need to mention amendments, because otherwise they're covered. And so now I'm authorizing amendments. So it seems in that sense it may cut the other way. Okay. But when we compare, as you have, the language used in Section A and the language used in Section B, there are two things to look at. The first is that in B, what is rendered unlawful, the Congress specifically instead of expressly requiring filing in A, Congress specifically declined to prohibit or include the words that are found in A, renew or amend. And Congress's choice not to render those acts unlawful in the context of the statute as a whole has to be read as Congress's decision not to prohibit those things after the arrangement has been approved in the first instance. And proof of that assertion, that there is significance to Congress's omission, that that is a choice not to require further Attorney General approval, rather than the approval in the first instance, is other language that follows in Section 1803B. The failing newspaper finding. If you accept the reading that the R.J. proffers, that every amendment is a new JOA that requires a new Attorney General approval, irrespective of whether that immunity has already been granted, you have to ignore the failing newspaper finding that must be made late, that appears later. When the Attorney General approved this JOA, he found that the Sun was a failing newspaper and also found that the 1989 JOA preserved the Sun, that it would have sufficient income to have an independent editorial voice and continue in publication because of the JOA, and it was no longer a failing newspaper. If you apply Section 1802 to in the manner that the R.J. posits, you have to ignore that that finding can no longer be made after a JOA has been approved. It would be impossible to make an amendment because at the time you would show up with the amendment, by virtue of the JOA, it would no longer be a failing newspaper. The Sun certainly wasn't a failing newspaper in 2005. It was insured to receive, through the year 2040, a minimum of $2.25 million per year under, I think that's Section A.1, for its editorial existence and 10% of the profits of the joint operation. You couldn't make the failing newspaper finding. And the truth is the R.J.'s reading would create an absurdity, meaning that no JOA could be amended. It couldn't meet the failing newspaper standard under the statute. Well, could you read the definition in 1802.5 of failing newspaper to essentially mean that it's failing in the absence of the JOA? That is not in the statute. 1802.5 is specifically defined as a probable likelihood of financial failure. It's in probable danger of financial failure. Probable danger of financial failure. So you take that finding at the time of application. You pointed out what is, I think, the most significant textual difficulty with that reading. Let me ask you what I think is the converse difficulty, which is, under your view, amendments escape AG scrutiny, including an amendment that would add a new newspaper. So in response to that, I think the best answer is to look at what happened in the Daily Gazette case or the Anzai case in Hawaii, where those were agreements that were presented to the Attorney General. I assume they were filed or, you know, when newspapers make changes like that, it's publicly known. Those were agreements that were styled as amendments, but they were in reality termination agreements. They were ending the relationship. And what happens, so this concern about newspapers never having free reign to make any change they want, that isn't what happens because the Justice Department maintains jurisdiction under the Sherman Act. In both of the two cases I just cited, they said you are not permitted to make an amendment that is inconsistent with the immunity that you've been provided already or that is inconsistent with why you have the freedom to or the exemption from the antitrust statutes in the first place. Where does that come from the text? Where did these limitations on amendments come from in the text of the statute under your reading? Well, I mentioned the Congress' decision not to include the terms renew or amend in Section 1803B that because of the way the statute works, and this Court's decision in Bronster explains this, that when the Attorney General has provided immunity, that immunity is lasting. There's a long discussion in Bronster that explains in invalidating a Hawaii state statute that was asking newspaper participants to keep providing financial information so they could demonstrate that the JOA was still necessary, that they were still under financial strain. This Court invalidated that Hawaii state statute and held that after immunity is granted, that is the end of what JOA participants are required to provide. They've been granted immunity. And granted, as I've already said, that immunity isn't boundless, but it is immunity. Congress did not prohibit an immunized relationship from making changes. That would be an absurdity, as I've described, because the statute doesn't permit a failing newspaper finding, or Congress certainly didn't intend that you could only amend the arrangement if you were. Why is that necessarily an absurdity? Because Congress could have thought, well, we're going to let you, you know, you're a failing newspaper in the first instance, the AG found that, and we're going to let you go enter into this arrangement. You get to continue in that arrangement, but if that arrangement does not actually solve your failing problem, and, you know, three years down the road, you're still going to fail, you can come back to us. But if it solves your failing problem and you're not going to fail, we're not going to let you amend it. It doesn't, it's not clearly to me that it necessarily makes it absurd. It just makes it. Oh, that's my. I think it's everyone. It's one of these emergency courts. Somebody didn't agree with me. I don't know if that's my answer. Don't answer that question. Let's pause for a second when it stops. That's the problem. We all turn our phones off, and it forces it in, and we involuntarily have to have noise in the court. Can we sanction them?  This is Judge Collins. Why don't we put another minute on the clock? But you see what I'm saying? It does make it, it would make it very hard to amend unless you were failing, but it doesn't make it absurd because you could, it would basically say you could only amend if you continued to be failing. In other words, the original arrangement didn't really actually save the newspaper or the piece of the newspaper. And that, there's nothing in the statute that, where you can import that that's what Congress intended, that the immunity that you receive once you've been scrutinized by the Attorney General is lesser than the grandfathered immunity, that once you have been approved, that your standing is the same as the grandfathered agreements. That it, and that's what this court said in Bronster, that that's the reason for that. And there's always the guide, same as we had in this case. Remember, we weren't trying to evade scrutiny. The amendment was submitted to the Justice Department the day it was executed, and the Justice Department took the position that it didn't have the authority to approve or deny, but we were investigated. We were investigated for multiple years and scrutinized, and it was determined that no action would be taken, that the amendment didn't otherwise violate the Sherman Act, and what would happen for an amendment that didn't comply, as you see in Daily Gazette and Anzai, the government steps in and brings an enforcement action. All right. Thank you, Counsel. Thank you. All right. We'll hear rebuttal. Thank you, Your Honors. I just want to make three quick points. The third point may be less quick. First, I think the case is as simple as Judge Collins put it, which is that an amended contract is still a contract. You fall under the plain terms. Congress, it's hard to think of what language you would use if you wanted to be broader. Well, what's your response to his point that, you know, including amendments in B doesn't make sense because the standard that would be applied can't be met in the context of amendments, and therefore it effectively bars amendments. What's your response to that? Yeah, so I have two responses, and the first is I do think that 18025 could be read as failing in the absence of the JOA. I put that aside. But my second answer is similar to, I think, what Judge Van Dyke was suggesting, which is there is no absurdity. I think what Congress could have easily wanted is before you go and make massive changes to a JOA, like we're done here, I won't repeat them all, but a geographic non-compete, moving from two separate subscriber bases to one subscriber base, you know, separate papers to one unified publication. Before you do that, you need to show that there's a financial reason for you to do so, and it just simply is not the case that any JOA eliminates the financial necessity. In fact, the record in this case shows that there's testimony about, I think, from The Sun, talking about drastic changes in the market. I think it's not obvious, actually, how the failing from – But looking strictly at the statute, then they're no longer a failing newspaper, though. No, but I'm not sure that – first of all, A, that may or may not be correct. Like, we need to – I think, actually, that's a factual question. And second, I think that the question is, so if they're not a failing paper, the result is, yes, then they could not have made massive amendments to the underlying agreement. But as Judge Van Dyke suggested, that's not an absurdity. That's just the plain text, right, of the statute, that if you are not in financial – they may or may not be here. Like, the record before this court is not settled on that. So, like, they may well be here. But second, Congress may well have wanted – indeed, the plain text suggests that if you are not a financial firm, you can't completely rework the agreement to draw in all sorts of distinctions without showing you're financially – you are a financial – you're in financial distress. And the additional point, Your Honor, is I just want to make clear, although we think the statute is very, very broad, there are limits on the statute. The statute says any agreement pursuant to which joint or common production facilities are established or operated, and it has to be one of the more following. So truly trivial amendments might not meet this definition in 18022. They would be agreements, but they might not be agreements pursuant to which joint or common production facilities are operated and joint or unified action. But with respect to big changes – like, this isn't the edge case – then our position is, one, the statute might well be read – we're not aware of any court construing it one way or the other, but we think 18025 may be read to mean failure in the absence of the JOA. And second, the plain text says before you make big changes in an agreement, you have to show financial distress. We don't think that's absurd at all. We think that actually makes a lot of sense and makes much more sense than the alternative, which is once you get an agreement, you can amend it however you want, and there is no review at all by the Attorney General. We just don't think that that is a plausible reading of the text, a plausible reading of the compromise that was struck, and sort of a plausible outcome. As between, you need to show financial – Sotomayor, whose agreement did, in fact, get a lot of review, didn't it, from the Attorney General? I – you know, a lot of review is not the text of the statute. And what the court – what the – it says by the Attorney General. That was a deliberate – you know, a deliberate choice. It's not a line attorney in the antitrust division. But just to be clear, what came out of the antitrust division was a finding of no immunity with respect to the amendment. So, like, if we're right on Levy, right, that that's unlawful, the DOJ didn't approve it. They said you don't have immunity for the – if you look at the – you know, at the letter, it says you don't have immunity for – and let me just get the site so we're – Your Honor has it. When you're talking about the DOJ no-action letter, that's at ER-427, they don't say this is approved, you know, everything is hunky-dory. They say the opposite, right? They say you don't get immunity for the – for the amended part of the agreement. And so, like – and then this is just my final point. You know, my friend on the other side says, like, this is somehow cutting back on the immunity that the Attorney General granted. We don't think that's true at all. They have immunity, the parties have immunity, for actions taken pursuant to the 1989 agreement. What they don't have is immunity for the thing the Attorney General did not sign off on, which is the 2005 agreement. For that, they would have to meet the standard in 1803b. They would have to get written approval by the Attorney General, and that might well involve a finding of financial distress, which, A, might well be made on this record, and, B, would certainly be not absurd to require given the kinds of changes we saw here. Okay. Thank you, Justice. All right. Thank you, counsel. Thank counsel for both sides for the helpful arguments in that case, and the case just argued will be submitted.
judges: COLLINS, VANDYKE, MENDOZA